IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | * |
| v. | * Crim. Case No. SAG-04-004 |
| **SHAWN HENRY,** | * |
| **Defendant.** | * |

* * * * * * * * * * * *

## MEMORANDUM OPINION

Shawn Henry, who is presently in Bureau of Prisons custody at FCI Fort Dix, has filed a Motion for Imposition of a Reduced Sentence Pursuant to Section 404 of the First Step Act. ECF 262. The Government filed an opposition, ECF 270, and Henry has replied, ECF 274. For the reasons that follow, Henry's Motion is DENIED.

### I.      Factual Background

The following facts are derived from the statement of facts in support of Henry's plea agreement. ECF 105. "From at least early 1996 through February, 2004," Henry personally directed the distribution of at least 30 kilograms of heroin, over 1.5 kilograms of cocaine base, and at least 50 kilograms of powder cocaine at drug shops located in the vicinity of the 2000 block of East North Avenue in Baltimore, Maryland. *Id.* The members of Henry's narcotics distribution conspiracy, known as the North Avenue Boys, possessed and used firearms to protect their drugs and their cash proceeds. *Id.* Henry personally possessed a 9mm firearm on August 11, 1999. *Id.* The North Avenue Boys maintained an ongoing dispute with a neighboring drug trafficking organization led by Charles Byers. *Id.* "In the course of this dispute, the defendant and members

1

of the defendant's organization used firearms to shoot members or person [sic] believed to be members of the Byers group wherever they were encountered." *Id.* Specifically,

> The evidence would also show that on January 9, 2001, the defendant, with other [North Avenue Boys] including Dante Faulkner, Ryan Ayres, Corey Grant, Tyrone Creighton and Charles Laster car jacked a Jeep Cherokee being driven by a female associated with a member of the Byers group and which was known to be driven by Byers. Upon finding that the Jeep was not being driven by Byers, the defendant and his associates took the victim to 1645 Normal Avenue. She was kept there for several hours, after which she was driven to another location where the defendant shot her in the neck with a .22 caliber handgun, leaving her wounded . . . The evidence would show that after the carjacking the defendant went into hiding. In February 2001, the defendant arranged for one of his associates (who was present at the car jacking and who would testify as a government witness) to meet with the source of supply described above for the purpose of continuing the distribution of heroin and cocaine by the defendant's organization. As a result, the distribution of approximately one hundred-twenty grams (or more) of heroin a day from that source continued until the arrest of the source in November 2001.

*Id.* Henry turned himself into state authorities for the carjacking in June, 2001, and was found guilty of Attempted First-Degree Murder for his participation in offense on August 26, 2002, receiving a sentence of ten years imprisonment. *See* Pre-Sentence Report for Shawn Henry ("PSR"), ¶¶ 21, 43, 44. On March 12, 2004, Henry first appeared in this Court on the federal charge. ECF 10.

On the first day of his scheduled jury trial, Henry pled guilty to conspiracy to distribute and possess with intent to distribute controlled dangerous substances, in violation of 21 U.S.C. § 846. ECF 105, 110. In advance of sentencing, the United States Probation Office prepared a Presentence Investigation Report ("PSR") that calculated Henry's offense level, criminal history score, and recommended guidelines range. *See* PSR, ¶¶ 25-45, 50. Based on the quantity of drugs involved in the conspiracy, the PSR calculated Henry's base offense level to be 38. *Id.* ¶ 25. Two levels were added because dangerous weapons (including firearms) were possessed over the course of the conspiracy, and a four-level increase applied because Henry was the leader of a criminal

conspiracy involving five or more participants. *Id.* ¶¶ 26, 28. Thus, Henry's adjusted offense level was 44, but he received a two-level reduction for his acceptance of responsibility, for an offense level of 42. *Id.* ¶¶ 30, 31. At criminal history level I, his guideline range was 360 months to life imprisonment. *Id.* ¶ 50. At sentencing, Judge Motz credited Henry 46 months of time that he had served in state custody for the attempted first-degree murder charge, and imposed a sentence at the low end of the guideline range, for a total of 314 months in prison. ECF 132.

On October 19, 2016, Judge Motz reduced Henry's sentence to 246 months imprisonment, a reduction of six-and-one-half years, pursuant to Amendment 782, which retroactively adjusted downward the offense level for certain drug offenses. ECF 246. After that adjustment, Henry's advisory guidelines range was 292-365 months imprisonment. ECF 247. Judge Motz again imposed the low end of the guidelines range, and again subtracted 46 months to give Henry credit for the time he had served on the attempted first-degree murder in state custody, before his initial appearance in federal court. ECF 246.

Henry now seeks a further reduction of his sentence to 153 months imprisonment, which would represent an additional reduction of 93 months. ECF 262, 274. He notes that he is serving a consecutive sentence of 87 months for his conviction in *United States v. Henry*, 05-147-JFM ("Case No. 05-147").[1] Under Henry's proposal, then, he would serve a total of 240 months imprisonment to satisfy his sentences in both cases.

---

[1] According to Henry's plea agreement in Case No. 05-147, immediately after their guilty pleas in Case No. 04-04, Henry and two of his co-defendants were placed in a holding cell in a detention facility with a witness who had been identified as an anticipated Government witness in their trial. *See* PSR for Sean Henry in Case No. 05-147, ¶¶ 10-11. Henry and his co-defendants confronted the witness, and then "assaulted the witness, knocked him to the floor, and punched and kicked him in the face, head and body until they were stopped by DOC personnel who observed the assault." *Id.* Henry and his co-defendants pled guilty to Retaliation against a Witness in violation of 18 U.S.C. § 1513(b)(1) and (c). *Id.* at 1.

## II. Qualifying Offense

Congress enacted the Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 (2010) ("FSA"), to remedy the inequality in mandatory minimum sentences between drug trafficking offenses involving crack cocaine and those involving powder cocaine. *See United States v. Gravatt*, 953 F.3d 258, 260 (4th Cir. Mar. 23, 2020). In the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, Congress made those changes retroactive, and permitted courts to reduce a defendant's sentence, upon the defendant's motion, where (1) the defendant was convicted of a "covered offense," namely a "violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the [Fair Sentencing Act of 2010]"; (2) the offense was committed before August 3, 2010; and (3) the defendant did not already receive a reduction under the First Step Act. *See United States v. Robinson*, Cr. No. PJM-02-0227, 2019 WL 3867042 at *2 (D. Md. Aug. 15, 2019).

Clearly, Henry committed the drug trafficking offenses in question before August 3, 2010. His sentence was predicated on his leadership role in a conspiracy distributing heroin, powder cocaine, and crack cocaine, with crack cocaine representing by far the lowest quantity of the three substances. However, as the Government somewhat begrudgingly concedes, the Fourth Circuit has explained that a multi-substance conviction still qualifies as a "covered offense" under the First Step Act, and poses no bar to a defendant's eligibility for a sentence reduction. *See United States v. Gravatt*, 953 F.3d 258 (4th Cir. 2020); *see also United States v. Wirsing*, 943 F.3d 175, 186 (4th Cir. 2019) ("All defendants who are serving sentences for violations of 21 U.S.C. § 841(b)(1)(A)(iii) and (B)(iii), and who are not excluded pursuant to the expressed limitations in Section 404(c) of the First Step Act, are eligible to move for relief under that Act."). The Fourth Circuit has found that because Congress did not intend to exclude defendants who committed acts

involving different types of controlled dangerous substances from benefitting from the remedial goals of the First Step Act, *see Gravatt*, 953 F.3d at 264, it follows that "a defendant convicted of conspiracy to possess with intent to distribute crack cocaine and powder cocaine was convicted of a covered offense." *United States v. Byers*, 801 F. App'x. 134, 135 (4th Cir. 2020) (*citing Gravatt*, 953 F.3d at 263-64). Further, under binding Fourth Circuit precedent, Henry remains eligible to seek sentencing relief despite the fact that the actual quantity of cocaine base involved in his conviction (1.5 kilograms) well exceeded the revised quantity (280 grams) needed to trigger a 10-year mandatory minimum penalty under the Fair Sentencing Act. *See Wirsing*, 943 F. 3d at 186.

Eligibility to move for relief, however, does not automatically equate to a sentence reduction, but simply affords Henry a review of the merits of his motion to determine whether the Court should exercise its discretion to impose a lesser sentence. *See Gravatt*, 953 F.3d at 262.

### III.     Section 3553(a) Factors

18 U.S.C. § 3553(a) prescribes the factors the Court must consider in determining whether it should reduce a defendant's sentence under Sections 404(b) and 404(c) of the First Step Act. *See Wirsing*, 943 F.3d at 183; *United States v. Logan*, Cr. No. CCB-10-0203, 2019 WL 3391618 *1 (D. Md. July 26, 2019). Those factors include (1) "the nature and circumstances of the offense;" (2) "the history and characteristics of the defendant;" (3) the need "to protect the public from further crimes of the defendant;" and (4) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a). The Court may also consider the defendant's conduct since his conviction. *See Logan*, 2019 WL 3391618 at *1; *Robinson*, 2019 WL 3867042 at *5.

Beginning with the nature and circumstances of his offense, Henry acknowledged being the leader of a conspiracy to distribute a large quantity of drugs – 50 kilograms of powder cocaine

5

and 30 kilograms of heroin, in addition to 1.5 kilograms of crack cocaine. *See* PSR ¶ 12. Moreover, as the Government notes, Henry's drug organization was a particularly violent one, and Henry himself participated in the violence, most notably by directing the carjacking and shooting the female carjacking victim in the neck. *See* PSR ¶ 19.

Henry concedes that his offenses were "no doubt serious," ECF 274 at 1. However, he suggests that "the total requested 240-month sentence . . . would adequately punish them." ECF 274 at 3. The flaw in Henry's argument is that it meshes his sentence for the very serious offenses in the instant case with the 87-month sentence he received for an entirely separate offense – the violent attack on a cooperating witness in the detention facility. Henry concedes that he "has requested a reduction of only the sentence in case number 04-04," ECF 274 at 5. He then correctly notes that the Court can also consider the adequacy of his aggregate prison term. *See Dean v. United States*, 137 S. Ct. 1170, 1175 (2017) ("[T]he 3553(a) factors are used to set both the length of separate prison terms and an aggregate prison term comprising separate sentences for multiple counts of conviction."). Henry, however, cannot have it both ways. In considering the aggregate 240-month sentence, this Court must consider its adequacy to address all of the conduct charged in both cases: the leadership role in a drug conspiracy distributing large quantities of several different controlled dangerous substances, the associated violence including carjacking and shooting a victim associated with a rival drug organization, and the retaliatory beating of a federal witness.

To consider the appropriateness of the proposed sentence to account for the nature and circumstances of the offenses, this Court does not operate in a vacuum, but can consider the advisory guideline ranges for the two cases of conviction. The math simply does not work in Henry's favor. For the drug conspiracy case, Henry's advisory guidelines range is 292-365

6

months.  For the witness retaliation case, his advisory guidelines range is 70-87 months.[2]  Adding those two ranges together results in a range of 362-452 months, meaning that Henry's proposed 240-month sentence would represent an enormous variance.  Such a result is simply unwarranted by the nature and circumstances of Henry's criminal conduct, which included a leadership role, an extremely significant drug quantity, violence involving the use of firearms, and witness retaliation.

Henry asks the Court instead to focus on the second factor, his history and characteristics, and especially his behavior during his incarceration, when he has "remained a loving and involved father and grandfather; completed an array of meaningful programming; earned a 'low' security classification; and developed a careful reentry plan."  ECF 274 at 1.  The Court recognizes, and does not discount, Henry's meaningful accomplishments during his term of imprisonment, and the support from his family and friends expressed in their letters attached to his motion.  ECF 262-4 through 262-7.  However, as the Government notes, Henry's disciplinary record while in prison has been less than stellar.  He has at least twelve sanctioned incidents between 2009 and 2019.  ECF 269-1.  While most of them are 300-level, or less serious, infractions, he received more significant discipline on two occasions for fighting and assault.  *Id.*  Of the greatest concern to the Court is a 100-level, or more serious, infraction for "possession of a hazardous tool," just ten months ago.  *Id.*  That recent and significant infraction makes it difficult for this Court to credit Henry's representation, in ECF 262-3, that he is ready to refrain from criminal conduct moving

---

[2] The advisory guidelines range for the witness retaliation count was calculated based on a cross reference to Guideline § 2X3.1, which states that "the base offense level is six levels lower than the offense level for the underlying offense," but "shall not be more than 30."  *See* PSR in Case No. 05-147, ¶ 15.  At the time, Henry's base offense level for the underlying offense in Case No. 04-04 was 42, but, as noted above, it was later reduced to 40, pursuant to Amendment 782.  Because 40 minus 6 still exceeds 30, Henry's offense level for the retaliation conviction would not change.

forward. Ultimately, then, the Court views the history and characteristics of the defendant as a neutral factor, neither supporting nor counseling against a sentence reduction.

Similarly, as to the third factor, the need to protect the public from further crimes of the defendant, the Court would certainly be hopeful that it could rely upon Henry's representation that he intends to be law-abiding in the future, with the support of his friends and family. However, as noted above, his recent and serious disciplinary infraction undermines that notion, and suggests that there is a continued need to protect the public from his conduct.

The final § 3553(a) factor is the need to avoid unwarranted sentence disparities. Perhaps because this case is highly unusual in its breadth, neither Henry nor the Government has cited to any cases that can be viewed as analogous for purposes of assessing like sentences.[3] The most apt comparators are Henry's co-conspirators in Case No. 04-04, each of whom received a sentence of at least 240 months imprisonment for their conduct in the violent drug conspiracy. *See, e.g.*, ECF 128 (Dante Faulkner sentence of 316 months, plus a consecutive 120 months sentence, for a total of 436 months); ECF 129 (Ryan Ayres sentence of 300 months); ECF 131 (Tyrell Fields sentence of 300 months); ECF 150 (Corey Grant sentence of 240 months); ECF 159 (London King sentence of 264 months); ECF 179 (Charles Laster sentence of 240 months). It is true that the co-conspirators pled guilty to different counts of conviction in constructing their individual plea agreements, so that the sentences imposed, while somewhat consistent in length, were not all calculated in the same way. Regardless, a reduction of Henry's sentence to just 153 months, well

---

[3] The cases cited by Henry are largely federal murder cases, in which the sentencing judges imposed sentences of twenty-five years or less. *See* ECF 274 at 3-4. While it is true that Henry's shooting did not result in his victim's death, the defendants in the murder cases he cites were not leaders of significant drug trafficking organizations, who also participated in a subsequent violent assault on a cooperating federal witness. Ultimately, the cases are simply not factually comparable enough to be persuasive to this Court.

below the lower sentences originally imposed on his subordinate co-conspirators who did not personally shoot anyone, would epitomize an unwarranted sentence disparity.[4] This Court notes that, today, a person convicted of similar conduct to Henry's would be subject to an additional two-level increase for the fact that the defendant "used violence, made a credible threat to use violence, or directed the use of violence." U.S.S.G. § 2D1.1(b)(2) (2018). Thus, given that the advisory guidelines range for a person engaging in identical conduct today would be even higher than 292-365 months, Henry's requested sentence of just 153 months would likely create an unwarranted sentence disparity even when compared to similarly situated defendants in unrelated cases. His existing 246-month sentence best situates him comparatively with respect to his co-defendants, and with respect to other unspecified defendants convicted of similarly serious conduct.

In total, then, even if the second and third factors are deemed neutral, the first and fourth § 3553(a) factors weigh strongly against reducing Henry's sentence.

## IV.   COVID-19 Considerations

In addition to the factors the Court considers in a standard § 3553(a) analysis, Henry contends that the Court should consider the effect of the COVID-19 pandemic on his incarceration. The institution where Henry is incarcerated, FCI Fort Dix, currently has two inmates who have tested positive for the virus, along with thirty-seven inmates and five staff members who have recovered from COVID-19 infection. *See* COVID-19 Cases, FCI Fort Dix, Bureau of Prisons,

---

[4] Fields and Faulkner, who also were convicted in Case No. 05-147, received consecutive 60-month sentences, in addition to their above-referenced 300-month and 436-month sentences in Case No. 04-04, respectively. *See United States v. Henry, Crim. No. 05-147,* ECF 41 and 42. Thus, an argument that Henry's aggregate sentence would remain at 240 months would not alleviate the dramatic sentencing disparity between his sentence and that of his two co-defendants, who did not have leadership roles in the conspiracy and also participated in assaulting the federal witness.

https://www.bop.gov/locations/institutions/ftd/ (last visited Aug. 4, 2020). Henry has informed the Court that he suffers from pre-existing conditions, including obesity, placing him at a higher risk for a poor prognosis if he were to contract COVID-19, *see* ECF 262 at 2. He also describes more difficult conditions of incarceration during the pandemic. *Id.*

This Court agrees with the courts that have found, in some circumstances, that the enhanced COVID-19 risks in an incarcerative setting may be one factor, but not a dispositive factor, to consider in determining whether to grant a defendant's motion for reduced sentence.[5] *See, e.g., United States v. Dennis*, Cr. No. RDB-08-0012 (D. Md. May 1, 2020) (acknowledging COVID-19 as one relevant factor in evaluating a motion for a reduced sentence pursuant to Section 404 of the First Step Act); *United States v. Proctor*, Cr. No. DKC 04-160, 2020 WL 1864584 (D. Md. Apr. 14, 2020) ("The current pandemic state of emergency is of great concern to the entire country . . . Immediate release, however, is not a panacea . . . ."). The BOP's efforts to prevent transmission within its facilities clearly present added hardships to the incarcerated population, as the BOP enacts dramatic measures to best protect and care for its inmates. *See United States v. Hiller*, Cr. No. ELH-18-389, 2020 WL 2041673 * 3-4 (D. Md. Apr. 28, 2020). The record at Fort Dix to date, however, suggests that the measures are working relatively well, and additionally suggests that appropriate medical care is being provided for those who do become infected. Thirty-

---

[5] While, in certain situations, the COVID-19 pandemic could be a factor that might tip the scales in favor of a sentencing reduction pursuant to Section 404 of the First Step Act, an inmate's particularized health concerns are generally better considered on a Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), which permits sentence modification for "extraordinary and compelling reasons." Such a motion requires the inmate to first exhaust his administrative remedies. *See United States v. Decator*, Crim. No. CCB-95-00202, 2020 WL 1676219, at * 1 (D. Md. Apr. 6, 2020).

seven previously COVID-positive inmates have fully recovered, with only two inmates experiencing active infection.

Neither this Court nor, unfortunately, anyone else can accurately predict who will or will not suffer complications from a viral infection. This Court's analysis of an individual's virus-related concerns is heavily guided by the CDC's published risk factors for incurring a severe, life-threatening case of COVID-19. On July 17, 2020, the CDC revised its guidelines, based on its analysis of newly obtained information. The CDC first examines the risk presented to a given individual based on their age. People Who Are at Increased Risk for Severe Illness: Older Adults, Ctrs. for Disease Control & Prevention (last visited Aug. 4, 2020), https://tinyurl.com/r9fsgvx [hereinafter CDC Age-Based Risk Factors]. Generally, "[a]s you get older, your risk for severe illness from COVID-19 increases." *Id.* The age group at the highest risk is those over the age of 65, as 8 out of 10 COVID-19 deaths reported in the United States are individuals in that group. *Id.* Henry is only forty-three years old. According to the CDC's most recent data, those ages 40 to 49 are hospitalized at a rate of 84.6 per 100,000 people. CDC Age-Based Risk Factors, *supra*. Accordingly, Henry's age places him at low risk for severe illness from COVID-19.

Next, the CDC discusses an individual's increased risk for severe illness from COVID-19 based on underlying medical conditions. From here, the CDC distinguishes between those conditions which do create an increased risk of severe illness, and those which might create an increased risk. People Who Are at Increased Risk for Severe Illness: People with Underlying Medical Conditions, Ctrs. for Disease Control & Prevention (last visited Aug. 4, 2020), https://tinyurl.com/y9chuzkm [hereinafter "CDC Underlying Condition Risk Factors"]. Those who are at an increased risk for severe illness are those who have:

- Cancer

- Chronic kidney disease;

- COPD (chronic obstructive pulmonary disease);

- Immunocomprimised state (weakened immune system) from a solid organ transplant;

- Obesity, defined as a BMI over 30;

- Serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies;

- Sickle cell disease; and

- Type 2 diabetes mellitus

*Id.* On the other hand, the following conditions might cause an increased risk for severe illness:

- Moderate to severe asthma

- Cerebrovascular disease

- Cystic fibrosis

- Hypertension or high blood pressure

- A compromised immune system from causes other than a solid organ transplant;

- Neurologic conditions, such as dementia;

- Liver disease

- Pregnancy

- Pulmonary fibrosis

- Smoking

- Thalassemia

- Type 1 diabetes mellitus

12

Henry is obese, which places him at increased risk of severe illness from COVID-19, according to the CDC's guidance. He also has a record of high blood pressure, which is a condition the CDC says might place him at an increased risk of severe illness.[6] In weighing Henry's relative risk of contracting COVID-19 at Fort Dix and experiencing severe complications with the other § 3553(a) factors, which generally weigh against a sentencing reduction, this Court cannot conclude that his immediate release from custody is warranted. Moreover, if Henry is not to be immediately released, then a lesser sentencing reduction based on COVID-19 concerns would be illogical, given the unknowns regarding the duration of the pandemic and the possible preventative or therapeutic advances that may develop.

## V.     Conclusion

In conclusion, after considering all the relevant factors, this Court concludes that Henry's current sentence of 246 months is most appropriate to accomplish the objectives described in 18 U.S.C. § 3553(a). Accordingly, Henry's Motion for Imposition of a Reduced Sentence Pursuant to Section 404 of the First Step Act is DENIED.

A separate Order will ISSUE.


DATED: August 17, 2020                              /s/
                                                    Stephanie A. Gallagher
                                                    United States District Judge

---

[6] Henry also suggests that his "history of childhood asthma" and "borderline diabetes" might pose risk factors. ECF 262. While moderate-to-severe asthma and Type 1 diabetes mellitus are on the lists of conditions that might pose an increased risk for severe illness, and Type 2 diabetes mellitus is on the list of conditions that does pose an increased risk, neither a "history of childhood asthma" nor "borderline diabetes" appears in the CDC's lists of risk factors.